## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| REI HOLDINGS, LLC, | : | |
|     Plaintiff, | : | |
| | : | No. 3:20-cv-01178 (VLB) |
|     v. | : | |
| | : | |
| EDWARD MARCUS A/K/A | : | July 27, 2021 |
| EDWARD L. MARCUS D/B/A | : | |
| THE MARCUS LAW FIRM, | : | |
|     Defendant. | : | |
| | : | |
| | : | |

### RULING ON DEFENDANT'S MOTION TO DISMISS, [ECF NO. 13]

Before the Court is a Motion to Dismiss the Plaintiffs' Complaint, [ECF No. 1], pursuant to Federal Rule of Civil Procedure 12(b)(6), brought by Defendant Edward Marcus A/K/A Edward L. Marcus D/B/A The Marcus Law Firm ("Marcus" or "Defendant"). [ECF No. 13].

Specifically, Defendant moves to dismiss Counts One, Two, and Six of Plaintiffs' Complaint, for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of implied contract, respectively, as an improper attempt to recast tort claims into ones arising under contract. Defendant also moves to dismiss Counts Three for breach of fiduciary duty, Seven and Eight for fraudulent and negligent non-disclosure, and Count Nine (violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.* ("CUTPA")), as time-barred. Defendant moves to dismiss Count Five for unjust enrichment should the Court deny Defendant's motion to dismiss the

breach of contract claim, or, in the alternative, moves to dismiss it owing to Plaintiff's unreasonable delay in bringing suit.   Finally, Defendant moves to dismiss Count Four for legal malpractice as time-barred "to the extent it relies upon or arises from alleged acts and/or omissions during Defendant's alleged representation of Plaintiff during it[s] purchases of the Tax Lien Portfolios."  [ECF No. 13 at 1-2].

For the reasons set forth herein Defendants' Motion to Dismiss will be GRANTED-IN-PART.

## I.  STANDARD OF REVIEW

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an

2

entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## II.  PROCEDURAL HISTORY

Although the Court will set out Plaintiff's allegations in the instant matter in detail, *infra*, the Court summarizes here to make the following procedural background understandable.

In 2015, Plaintiff, a Utah-based limited liability company, purchased two portfolios of tax liens on Connecticut properties. First, in February 2015, Plaintiff purchased the "Optimum Portfolio" for $3,912,852.35 from Optimum Asset Management, LLC ("Optimum"), and second, in July 2015, Plaintiff purchased the

"LienClear 0001 Portfolio" for $370,298.33 from LienClear0001, LLC ("LienClear0001"). [ECF No. 1 ¶¶ 14, 15]. Optimum and LienClear0001 were owned by Thomas McOsker ("McOsker'), Donald Byrne ("Byrne"), and Dan Friedman ("Friedman"). *Id.* ¶ 7. Plaintiff engaged Defendant Edward Marcus d/b/a The Marcus Law Firm for legal services associated with the purchase of the two lien portfolios and for services associated with collecting or enforcing the liens contained therein. *Id.* ¶¶ 1-31.

Plaintiff alleges that it discovered that the lien portfolios were worth far less than it assumed, allegedly due to fraud and other misconduct by Defendant and McOsker, Byrne, and Friedman and their related business entities. *Id.* ¶¶ 18-29.

On June 12, 2017, Plaintiff brought suit in an eight count Complaint in the District of Utah against LienClear0001, McOsker, Byrne, and Friedman, three other entities owned by McOsker, Byrne, and Friedman named BCMG, LLC, BFNH, LLC, and BLOXTrade, LLC, another involved individual named Ben Edwards, and "Whitney Avenue," d/b/a The Marcus Law Firm, *i.e.* Defendant here, who was at that time retained by Plaintiff to enforce and otherwise execute on the two Connecticut lien portfolios. *REI Holdings, LLC v. LienClear-0001*, No. 2:17-cv-00564, [ECF No. 1] (D. Utah June 12, 2017).

4

Plaintiff sued Defendant Marcus specifically in four of the counts for Conspiracy to Commit Fraud (Count II), Fraud (Count V), Breach of Fiduciary Duty (Count VI), and Unjust Enrichment (Count VIII). *Id.*, [ECF No. 5 at 11-12, 15-18].

On August 15, 2017, Plaintiff terminated Defendant's engagement. *REI Holdings, LLC v. Marcus*, No. 3:20-cv-01178 [ECF No. 1 ¶ 17] (D. Conn. Aug. 13, 2020).

On October 13, 2017, Defendant Marcus, a Connecticut attorney and sole proprietor of a Connecticut law firm, moved to dismiss the District of Utah Complaint for lack of personal jurisdiction, arguing that Plaintiff "fail[ed] to allege any activity within Utah that would establish that [Defendant] ha[d] continuous and systematic contacts with Utah.  Furthermore, [Defendant] lacks sufficient minimum contacts to support the exercise of specific personal jurisdiction."[1] *REI Holdings, LLC v. LienClear-0001*, No. 2:17-cv-00564, [ECF No. 24 at 2] (D. Utah Oct. 13, 2017).

The other defendants followed suit, with Friedman, domiciled in North Carolina, and Optimum, a North Carolina LLC, moving to dismiss for lack of personal jurisdiction on November 9, 2017, *id.*, [ECF No. 30], and the remaining defendants, residents of Puerto Rico, Delaware, or New York, moving to dismiss for lack of personal jurisdiction on January 26, 2018.  *Id.*, [ECF No. 43].

---

[1] Defendant also moved to dismiss on improper venue, process, and service of process grounds.

5

On September 10, 2018, Plaintiff filed suit in the District of Delaware against LienClear0001, McOsker, Byrne, BCMG, BLOXTrade, and another entity, LienClear, alleging misconduct in the sale of portfolios of tax liens on properties in Ohio. *REI Holdings, LLC v. LienClear 0001, LLC*, No. 1:18-cv-01401, [ECF No. 1] (D. Del. Sept. 10, 2018).

On February 8, 2019, Judge Clark Waddoups in the District of Utah granted the three groups of Defendants' motions to dismiss for lack of personal jurisdiction, *REI Holdings, LLC v. LienClear-0001*, No. 2:17-cv-00564, [ECF No. 54] (D. Utah Feb. 8, 2019), analyzing each group of defendants separately and finding, as regards Defendant Marcus, that "Marcus did not 'purposely direct its efforts' at Utah" and that "[a]ny contacts by Marcus with REI in Utah were only incidental to that representation." *Id.* at 13 (quoting *Newsome v. Gallacher*, 722 F.3d 1257, 1281 (10th Cir. 2013)). Judgment entered for Defendants the same day and the case was closed. *Id.*, [ECF No. 55]. Plaintiff REI did not appeal the court's ruling.

On October 8, 2019, REI filed another suit in the District of Delaware against LienClear0001, McOsker, Byrne, BFNH, Optimum, and another entity, LienClear 0002, LLC, in a five count Complaint alleging fraud in the inducement, breach of contract, and unjust enrichment in that "Defendants intentionally misrepresented the value of the [Optimum and LienClear0001 Connecticut] tax lien portfolios to REI in order to induce REI to purchase the portfolios at inflated

prices." *REI Holdings, LLC v. LienClear 0001, LLC*, No. 1:19-cv-01913, [ECF No. 1 ¶ 14] (D. Del. Oct. 8, 2019).

On December 2, 2019, the Delaware District Court ordered the two District of Delaware cases, Nos. 1:18-cv-01401 and 1:19-cv-01913, consolidated, with case No. 1:18-cv-01401 designated the lead case. *REI Holdings, LLC v. LienClear 0001, LLC*, No. 1:18-cv-01401, [ECF No. 35] (D. Del. Dec. 2, 2019).  On December 20, 2019, Plaintiff filed an Amended Consolidated Complaint against all defendants from both cases, for Ohio and Connecticut lien portfolios, alleging fraud in the inducement (Count I – Ohio, Count IV – Connecticut), breach of contract (Counts II, III – Ohio, Counts V, VI, VII – Connecticut), and unjust enrichment (Count VIII – Connecticut, Count IX – Ohio).  *Id.*, [ECF No. 36].

On February 21, 2020, the defendants moved to dismiss Plaintiff's claims for fraud in the inducement (Counts I and IV), and unjust enrichment (Counts VIII and IX), *id.*, [ECF No. 42], arguing, *inter alia*, that the fraud claims were not pled with sufficient particularity under Federal Rule of Civil Procedure 9(b), and that the unjust enrichment claims were not adequately pled in the alternative to the breach of contract claims.  *Id.*, [ECF Nos. 42, 43].

On August 13, 2020, Plaintiff sued Defendant Marcus in this District.  *REI Holdings, LLC v. Marcus*, No. 3:20-cv-01178 [ECF No. 1] (D. Conn. Aug. 13, 2020).

7

On September 25, 2020, Defendant filed the motion to dismiss *sub judice.* [ECF No. 13].[2]

On November 6, 2020, the District of Delaware granted-in-part Defendants' Motion to Dismiss Plaintiff's fraud in the inducement and unjust enrichment claims, dismissing the fraud in the inducement claims against Defendants as regards the Connecticut lien portfolios and dismissing the unjust enrichment Count against Defendants for the Connecticut liens.  *REI Holdings, LLC v. LienClear 0001, LLC,* No. 1:18-cv-01401, [ECF No. 54] (D. Del. Nov. 6, 2020].

On December 18, 2020, Defendants Answered the Amended Consolidated Complaint and asserted a Counterclaim for Breach of the LienClear0001 Agreement, which had formed the basis for the sale of the LienClear0001 Lien Portfolio to Plaintiff.  *Id.,* [ECF No. 58].  On January 8, 2021, Plaintiff REI Answered the Defendants' Counterclaims.  *Id.,* [ECF No. 59].  The District of Delaware case is now proceeding on the Parties' breach of contract claims, with discovery due December 23, 2021, and dispositive motions due January 14, 2022.  *Id.,* [ECF No. 56].

---

[2] On December 10, 2020, the Court granted the Parties' Joint Motion to Stay pending resolution of Defendant's Motion to Dismiss "in light of the Motion to Stay's persuasive discussion of the extent of required discovery and the Court finding that Defendant's motion to dismiss 'do[es] not appear to be without foundation in law.'"  [ECF No. 24 (quoting *ITT Corp. v. Travelers Cas. & Sur. Co.,*

### III.  ALLEGATIONS IN THE INSTANT MATTER

In reviewing a motion to dismiss, the Court considers the allegations of the complaint to be true.  *Hayden*, 594 F.3d at 161.

The Plaintiff, REI Holdings, LLC ("REI" or "Plaintiff"), is a Utah-based limited liability company and is in the business of purchasing portfolios of tax lien certificates issued by municipalities.  [ECF No. 1 ¶¶ 1, 5].  Defendant Marcus is a Connecticut attorney practicing in North Branford, Connecticut.  *Id.* ¶ 2.

REI brings this suit claiming breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, legal malpractice, unjust enrichment, breach of implied contract, fraudulent nondisclosure, negligent nondisclosure and CUTPA, arising out of Marcus' legal representation "in connection with the purchase and subsequent collection of two (2) portfolios of tax lien certificates issued by the cities of Hartford, Bridgeport and West Haven, Connecticut (the 'Portfolios')."  *Id.* ¶ 6.

"[I]n or around February 2015," REI was approached by Friedman, McOsker, and Byrne "regarding the purchase of the Portfolios."  *Id.* ¶ 7.  Prior to the transactions, and "unbeknownst to REI" at the time, "McOsker, Byrne and Friedman individually and through their business entities acting in concert"— LienClear0001; LienClear0002; BFNH; and Optimum—"had agreed to purchase rights to the tax liens in the Portfolios from the original owner of the liens,

---

No. 3:12-cv-00038 (RNC), 2012 WL 2944357, at *2 (D. Conn. July 18, 2012))].

American Tax Funding, LLC ('ATF'), for approximately $400,000.00." *Id.* "The purchase was made for the express purpose of 'flipping' the liens to REI for *full redemptive value* even though there were significant problems with the liens that negatively affected their value, which were known to McOsker, Byrne, Friedman, and their related business entities." *Id.* (emphasis in original).

McOsker, Byrne, and Friedman referred REI to Marcus, who "represented ATF in the collection of the liens in the Portfolios prior to the purchase by REI." *Id.* ¶¶ 8, 9. Marcus, McOsker, Byrne, and Friedman failed to disclose that Marcus represented ATF. *Id.* ¶ 9.

REI retained Marcus, to represent its interests "in [connection with] the purchase of the Portfolios," as "Marcus represented to REI that he had significant experience in the purchase and collection of Connecticut municipal tax liens and possessed the requisite professional expertise to represent REI in the purchase, resale, and collection of the liens in the Portfolios." *Id.* ¶ 10.

There was no letter of engagement between REI and Marcus. *See* Connecticut Rules of Professional Conduct 1.5(b). "Under an oral agreement in or around February 2015, REI and Marcus agreed that Marcus would provide all services necessary to ensure that valid and legal assignment of the tax liens in the Portfolios to REI [occurred] so that REI had the ability and legal entitlement to re-sell and/or collect, receive and retain the balance due and to enforce the collection of the tax liens." *Id.* ¶ 11. More specifically, those "necessary services

included but were not limited to": (a) "[r]eviewing and negotiating the terms [of] purchase agreements for the Portfolios;" (b) "[i]nvestigating that the seller's representation in the purchasing agreement were true"; (c) "[e]nsuring that the 'Tax Lien Documents' as the term [wa]s defined in the agreements were delivered to REI"; (d) "[i]nvestigating that the Servicer's representation in the Optimum Agreement were true"; (e) "[c]onfirming that the Servicer in the Optimum Agreement was correctly and legally licensed to act as a servicer of the Optimum Portfolio in the State of Connecticut; and" (f) "[e]nsuring that REI was properly licensed to engage in the business of collecting and foreclosing tax liens in the State of Connecticut." *Id.* ¶ 12.

Plaintiff purchased one of the portfolios from "Optimum for $3,912,852.35 in February 2015 (the 'Optimum Portfolio') under a certain Tax Lien Purchase and Servicing Agreement (the 'Optimum Agreement')." *Id.* ¶ 14. It purchased the second portfolio from "LienClear0001 for $370,298.33 in July 2015 (the 'LienClear 0001 Portfolio') under a certain Tax Lien Purchase and Sale Agreement (the 'LienClear0001[] Agreement[]')." *Id.* ¶ 15.

"REI paid Marcus the sum of $42,250 for legal services ($35,000) and lien recording fees ($7,250) in connection with the purchase of the two Portfolios." *Id.* ¶ 16. "REI also paid Marcus the sum of $411,167.90 for attorney fees and costs incurred by Marcus for services rendered to, upon information and belief, ATF and possibly others in connection with the collection of the liens in the Portfolios

prior to the sale to REI."  *Id.*  "Thereafter, Marcus continuously represented REI in the enforcement and collection of the tax liens in both Portfolios until his termination on August 15, 2017."  *Id.*

"The Portfolios were of little or no value, as a substantial portion of all of the liens were expired, paid off, released, or otherwise invalid or had little to no value compared to the purchase prices all of which was known by Marcus, McOsker, Byrne and Friedman."  *Id.* ¶ 19.  "Many of the liens were low cost liens, for which the cost to enforce was greater than the amounts that could be recovered."  *Id.* ¶ 20.  "The biggest unrecoverable costs were the title searches that were required to identify the volume and page number of the liens and the assignments – which Marcus should have had in [his] possession and control, but failed to provide to REI."  *Id.*  "Indeed, Marcus destroyed tax lien certificates that contained this information and failed to keep proper records to identify these liens at a later time."  *Id.* ¶¶ 20, 25.

McOsker, Byrne, and Friedman, and their related business entities, "deleted data from the Portfolios to conceal material facts from REI and to induce REI to purchase the Portfolios."  *Id.* ¶ 23.  "For instance, Friedman, McOsker and Byrne did not identify that certain liens in the Portfolios had already been paid off, and upon information and belief, removed this information from the notes on the Portfolios."  *Id.*  "This had the effect of artificially inflating the value – and therefore the purchase price – of the liens."  *Id.*  "ATF, the original purchaser of

the Portfolios, would have conducted significant due diligence on its purchase and would have identified liens that had been paid off to the city and/or otherwise redeemed, released or voided, and that information would be available from ATF's servicing notes, if not for Friedman's, McOsker's and Byrne's intentional actions to delete such information." *Id.* "As attorney for ATF, Marcus knew or should have known or at least had access to this information." *Id.* "Instead, REI had to pay Marcus exorbitant amounts as part of the acquisition of the Portfolios and then 'relearn' about the problems, paying Marcus tens of thousands of dollars more in attorney's fees and costs along the way, even though Marcus had access to this information prior to the sale to REI of the Portfolios." *Id.*

Many of the liens had already been released or voided by the municipalities at the time of REI's purchase in 2015, and BCMG, LienClear0001, and Optimum never provided the certificates for the liens that were purchased. *Id.* ¶¶ 24–25. "Prior to the closing of the Optimum Portfolio, Plaintiff was not informed by Marcus that the municipalities needed to consent to the transfer of the liens in the Portfolios to REI before the transfer occurred," *id.* ¶ 26, notwithstanding Optimum's representations that "they had the authority to sell the liens to REI." *Id.* Marcus knew that these consents were required and had not been obtained from Bridgeport or West Haven at the time of closing. *Id.* ¶ 27. Consent was obtained only "for the assignment of the liens to Optimum." *Id.*

13

Regarding the liens "in which payments had been made by the property owners directly to the municipalities, the municipalities denied payments to REI" because consent had not been obtained.  *Id.* ¶ 28.  Following the sale of the Portfolios, REI learned it "could not resell the liens without consent of the municipalities."  *Id.* ¶ 29.  "Marcus, Byrne, McOsker and Friedman knew that REI intended to resell the liens to individual customers when liens were sold to REI. Marcus did not inform REI until November of 2015 that such practice was disallowed by the municipalities, causing REI to have to refund numerous customers."  *Id.*

"But for the conduct of Marcus prior to the closing . . ., REI would not have purchased the portfolios for the purchase prices stated in the Optimum Agreement and LienClear0001 Agreement."  *Id.* ¶ 31.

### IV.  ANALYSIS

#### A.    Count One (Breach of Contract)

Defendant moves to dismiss Count One of Plaintiff's Complaint for breach of contract because Plaintiff improperly "attempts to recast its tort claims as claims for breach of contract."  [ECF No. 13-1 at 15].  Specifically, Defendant argues that despite Plaintiff asserting that "Marcus breached its oral agreement to represent REI in the purchase of the Portfolios such that REI would receive the benefits thereof including but not limited to obtaining clear and valid [] existing tax liens for resale" and other alleged breaches, this count "fails to allege any

14

specific actions or undertakings, or any refusal to undertake certain actions, by [Defendant] Marcus beyond a general duty of care imposed upon any attorney." [ECF No. 13-1 at 15-16].

Defendant cites numerous Connecticut courts at all levels that have held that "putting a contract tag on a tort claim will not change its essential character. An action in contract is for the breach of a duty arising out of a contract; an action in tort is for a breach of duty imposed by law." *Id.* at 16 (quoting *Gazo v. Stamford*, 255 Conn. 245, 263 (2001)). Connecticut courts have also held, Defendant argues, that "one cannot bring an action in both negligence and contract merely by couching a claim that one has breached a standard of care in the language of contract," *id.* (quoting *Alexandru v. Strong*, 81 Conn. App. 68, 80 (2003)), and "[w]hen a defendant's liability to a plaintiff is premised, however, on principles of tort law the plaintiff may not convert that liability into one sounding in contract merely by talismanically invoking contract language in his complaint. ... Courts have held that tort claims cloaked in contractual language are, as a matter of law, not breach of contract claims." *Id.* at 16-23 (quoting *Pelletier v. Galske*, 105 Conn. App. 77, 81 (2007) and citing numerous other cases holding similarly)]. The *Pelletier* case is important, Defendant claims, because there, the Defendant attorney was alleged to have breached contractual duties by failing to advise the plaintiff that the condominium unit she purchased was an affordable housing unit, subject to certain resale price restrictions, which caused Plaintiff

15

monetary damage.   The Superior Court granted Defendant's motion to strike, holding that "[a]n implied contract to deliver good title to real estate is in essence a negligence claim and is insufficient to sustain a contract claim against an attorney based solely on the contract of engagement."  *Id.* at 21 (quoting *Pelletier*, 105 Conn. App. at 79-80).  The Connecticut Appellate Court affirmed:

> The court properly concluded that the plaintiff's complaint sounds only in tort and does not state a legally sufficient claim of breach of contract.  A fair reading of the complaint reveals that the *gravamen of the action was the alleged failure by the defendant to exercise the requisite standard of care* in failing to advise the plaintiff that the condominium unit she purchased was an affordable housing unit and, as such, was subject to resale price limitations for a period of twenty years … Nothing in the plaintiff's complaint removes her claim from the ambit of malpractice.  Notwithstanding that embedded in the language of the plaintiff's claim are the contractual rudiments of promise and breach, where the plaintiff alleges that the defendant negligently performed legal services the complaint sounds in negligence, even though he also alleges that he retained him or engaged his services.

*Id.* at 21-22 (quoting *Pelletier*, 105 Conn. App. at 81-82) (emphasis added by Defendants).

Breach of contract requires, according to Defendant, "specific actions that the defendant has expressly agreed to perform but failed to undertake," a "refusal to take certain actions" on defendant's part, or breach of "an agreement to obtain a specific result."  *Id.* at 22 (quoting *Weiner v. Clinton*, 106 Conn. 379, 383 (2008)). In sum, according to Defendant, "Plaintiff has not asserted any promise to undertake a specific action, a refusal to undertake a specific action, or breach of a promise to obtain a specific result, as required by prevailing law.  Accordingly,

16

although Count I nominally seeks recovery for breach of contract, it does not sufficiently allege a cause of action for breach of contract and should be dismissed." *Id.* at 15.

Plaintiff, relying on *Hill v. Williams*, 74 Conn. App. 654, 655 (2003), counters that an attorney's "refusal" to perform an act required by a contract with the plaintiff gives rise to a claim for breach of contract. [ECF No. 22-1 at 7-8]. In *Hill*, Plaintiff argues, the court held that "use of the word 'refuse' imports an 'intentional' act rather than some inadvertence or negligent act or omission on the part of the defendant [attorney] in breach of the agreements between the parties." *Id.* at 7-8 (quoting *Hill*, 74 Conn. App. at 660). Plaintiff argues that its case is similar to *Hill*, in that the Complaint alleges that defendant Marcus entered into "an oral agreement" with Plaintiff to "provide all services necessary to ensure that valid and legal assignment of the tax liens in the Portfolios to [Plaintiff] so that [Plaintiff] had the ability and legal entitlement to re-sell and/or to collect, receive and retain the balance due and to enforce the collection of the tax liens," but (1) Defendant "fail[ed] to inform Plaintiff that 'the Portfolios were of little or no value, as a substantial portion of all of the liens were expired, paid off, released, or otherwise invalid or had little to no value compared to the purchase prices all of which was known by [Defendant]," and (2) "[a]fter the sale of the Portfolios, [Plaintiff] learned – because [Defendant] had not informed [Plaintiff] prior to the closing – that [Plaintiff] could not resell or transfer the liens without

consent of the municipalities."  [ECF No. 22-1 at 9 (quoting Complaint ¶¶ 11, 19, 29)].

Plaintiff argues further that while "Defendant in this case did not technically 'refuse' to follow any of Plaintiff's instructions as the attorneys did in *Hill* . . . , it is a distinction without a difference" because "Defendant knew that at least some of the liens that Plaintiff was purchasing had been paid or released and because Defendant knew that the liens could not be resold and transferred by Plaintiff after the purchase, Defendant was knowingly unable to comply with the agreement and therefore, intentionally breached his agreement with Plaintiff despite taking an exorbitant fee."  *Id.* at 10.

Plaintiff sums up that "under the prevailing case law, when the breach is intentional and not simply inadvertent, negligent and in violation of the standard of care - as the breach was in *Hill*, and in this case, then an attorney's conduct can be actionable under a breach of contract theory and professional negligence."  *Id.* at 11.

Defendant replies that *Hill* is "entirely distinguishable," because here, unlike *Hill*, "nothing in the current Complaint alleges that the Defendant refused to do anything or that he acted intentionally," in that "[o]bstacles pertaining to the Plaintiff's ability to resell the subject tax liens do not equate a breach of contract" and "the Plaintiff's argument that the Defendant did not reveal alleged knowledge regarding the value of the Portfolios or the requirement of municipal

18

consents do not constitute a breach of any specific contractual duties." [ECF No. 23 at 6-7]. In sum, according to Defendant, "[t]he Plaintiff's Objection amounts to nothing more than allegations of failures to disclose, not intentional acts or omissions relating to any specific promises or agreements." *Id.* at 7. The Court agrees with Defendant, because a review of Plaintiff's Complaint and the applicable caselaw reveals that Plaintiff's Complaint sounds primarily in tort, not contract.

First, it is well-settled that a party can sue an attorney in both tort and contract. *Stowe v. Smith*, 184 Conn. 194, 199 (1981) (holding that a complaint may "state a cause of action in both contract and tort") (citing Prosser, *Law of Torts*, p. 621 (4th ed. 1971)); *Hill*, 74 Conn. App. at 658 ("Our Supreme Court has recognized that not all claims against an attorney are necessarily actions in tort" and a claim in contract against an attorney may go forward where "the complaint goes beyond being merely 'couched in the language of tort'") (citing *Stowe*, 184 Conn. at 198-99 and quoting *Shuster v. Buckley*, 5 Conn. App. 473, 478 (1985)).

As *Hill* makes clear, when attorney and client enter into a contract for a specific result, and the attorney intentionally refuses to perform, an action for breach of contract may lie. 74 Conn. App. at 662-63 (reversing grant of summary judgment to defendant on breach of contract count as "allegations sounding in contract are contained in the [Complaint]," which alleged "defendant's refusals to take certain actions in furtherance of the matters for which the defendant had

19

been hired"); *see also Conn. Educ. Ass'n, Inc. v. Milliman USA, Inc.*, 105 Conn. App. 446, 459-60 (2008) (holding complaint sounded in contract when it was alleged that defendant attorney agreed, pursuant to contract, "to maintain [Plaintiff's] pension plan in compliance pursuant to the Internal Revenue Service code and ERISA," but failed to take these "specific actions.").[3]

Failure to allege refusal or failure to perform specific actions required by contract is fatal to a contract claim. *Weiner v. Clinton*, 106 Conn. App. 379, 384-85 (2008) (finding "plaintiff's claim was one sounding in malpractice masked in contract garb" when "[t]he second count of the complaint contains no allegations that refer to specific actions required by the defendant; nor does it contain allegations of the defendant's refusal to take certain actions"; nor alleges that "defendant who is a professional breached an agreement to obtain a specific result."); *Gazo*, 255 Conn. at 266 ("although the plaintiff has cast this claim in contractual language, in essence he seeks a tort recovery."); *Alexandru*, 81 Conn. App. at 79 ("[w]here the plaintiff alleges that the defendant negligently performed legal services and failed to use due diligence the complaint sounds in negligence, even though he also alleges that he retained or engaged his services."); *Law Offices of Thomas E. Porzio, LLC v. Northern Expansion, LLC*, No. CV-08-5008203-S, 2009 WL 1312516, at *4 (Conn. Super. Ct. Apr. 15, 2009) (striking

---

[3] The *Milliman* court affirmed the trial court's entry of judgment for Defendant, however, for failure of Plaintiff to prove at trial that the alleged contract actually existed. 105 Conn. App. at 461.

breach of contract counterclaim where complaint "consistently characterize[d] the law firm's oversight as careless and negligent, as opposed to conscientious and intentional.").

The closest case on point is *Pelletier*, 105 Conn. App. 77 (2007), in which plaintiff alleged that:

> when the defendant accepted her fee for the purchase of the condominium unit, an attorney-client contract was formed.   The plaintiff further alleged that the defendant breached his contractual duties in one or more of the following ways: by failing to advise her that the condominium unit was classified as an affordable housing unit; by failing to advise her that, as an affordable housing unit, the condominium unit would be subject to resale price limitations for a period of twenty years; by failing to have her sign an acknowledgement that the defendant had explained the affordable housing covenants that applied to the condominium unit; and by failing to explain those affordable housing covenants to her.
> The plaintiff also alleged that, as a result of the defendant's breach of his duties under the attorney-client contract, she had expended large sums of money on improvements to the condominium unit and would not be able to recover such sums in a future sale.  Finally, the plaintiff alleged that in agreeing to act as her attorney in connection with the closing, the defendant contracted 'to deliver a specific result, namely to deliver title to the condominium unit at the closing with no restrictions on potential resale, but failed to do so.'

*Id.* at 79.  The Court held that

> a fair reading of the complaint reveals that the gravamen of the action was the alleged failure by the defendant to exercise the requisite standard of care in failing to advise the plaintiff that the condominium unit she purchased was an affordable housing unit and, as such, was subject to resale price limitations for a period of twenty years, failing to have her sign an acknowledgement that the defendant had explained the affordable housing covenants that applied to the condominium unit and failing to explain those affordable housing covenants to her.   Nothing in the plaintiff's complaint removes her claim from the ambit of malpractice.

> **Notwithstanding that embedded in the language of the plaintiff's claim are the contractual rudiments of promise and breach, '[w]here the plaintiff alleges that the defendant negligently performed legal services . . . the complaint sounds in negligence, even though he also alleges that he retained him or engaged his services.'**

*Id.* at 82-83 (citing *Shuster*, 5 Conn. App. at 478).

Here, as in *Pelletier*, Plaintiff alleges that it purchased two lien portfolios, but those portfolios were encumbered by restrictions that Defendant was aware of that made them worth less than Plaintiff thought, but Defendant failed to reveal same to Plaintiff.  "The Portfolios were of little or no value, as a substantial portion of all of the liens were expired, paid off, released, or otherwise invalid or had little to no value compared to the purchase prices all of which was known by [Defendant] Marcus,"  [ECF No. 1 ¶ 19], but Defendant "fail[ed] to inform Plaintiff that 'the Portfolios were of little or no value.'"  *Id.* ¶ 11.  Plaintiff also alleges that "[u]nder an oral agreement in or around February 2015, REI and Marcus agreed that Marcus would provide all services necessary to ensure that valid and legal assignment of the tax liens in the Portfolios to REI so that REI had the ability and legal entitlement to re-sell and/or to collect, receive and retain the balance due and to enforce the collection of the tax liens," *id.* ¶ 11.  But the failure to "provide all services necessary" or the failure to inform is hardly the "refusal" to take specific action that can support a breach of contract claim, *Hill*, 74 Conn. App. at 655, and is closer to the defendant attorney's failure to inform in *Pelletier* that the Connecticut Appellate Court found could not support a breach of contract claim.

22

In the very next paragraph Plaintiff delineates what the stated "services" entailed:

> a. Reviewing and negotiating the terms of the purchase agreements for the Portfolios;
> b. Investigating whether the seller's representations in the purchasing agreement were true;
> c. Ensuring that the "Tax Lien Documents" as that term is defined in the agreements were delivered to REI;
> d. Investigating whether the Servicer's representations in the Optimum Agreement were true;
> e. Confirming that the Servicer in the Optimum Agreement was correctly and legally licensed to act as a servicer of the Optimum Portfolio in the State of Connecticut; and
> f. Ensuring that REI was properly licensed to engage in the business of collecting and foreclosing tax liens in the State of Connecticut.

[ECF No. 1 ¶ 12].  But nowhere in the Complaint does Plaintiff allege which of these specific actions Defendant refused to perform.  Plaintiff does not allege Defendant undertook to obtain approval from the originating municipalities to resell the liens, to verify the outstanding balance or value of each lien or any of the other specific undertakings Plaintiff alleges Defendant failed to perform. Plaintiff concedes as much, [ECF No. 22-1 at 10 ("Defendant in this case did not technically 'refuse' to follow any of Plaintiff's instructions as the attorneys did in *Hill* and *Meyers*.")], but argues that his breach of contract claim is still valid.  The Court simply disagrees and finds that "the gravamen of the plaintiff's claim against the defendant is based not on his failure to represent him, but on his failure to represent him properly."  *Pritsker v. Thygerson*, No. FBT-CV-17-5032900-S, 2018 Conn. Super. LEXIS 6911, at *16-18 (Conn. Super. Ct. July 9,

2018) (striking breach of contract claim based on alleged oral contract even where "plaintiff repeatedly requested that the defendant perform certain actions on his behalf, which the defendant refused," as that "d[id] not establish that a contract for specific services existed between the parties.") (citing *Pelletier*, 105 Conn. App. at 81); *see also Middlesex Mut. Assur. Co. v. Gunther Homes Inc.*, No. UWY-CV-17-6034585-S, 2019 Conn. Super. LEXIS 3227, at *12-15 (Conn. Super. Ct. Feb. 8, 2019) (granting summary judgment on breach of oral contract claim where there were no specific actions required "or other contractual obligation which would rise to the level of a separate breach of contract claim.  The complaint is clearly one in tort.   Courts have held that tort claims cloaked in contractual language are as a matter of law, not breach of contract claims.") (citing *Pelletier*, 105 Conn. App. at 81).

The Court pauses to note that Defendant Marcus, as discussed, *supra*, was a Defendant in the first lawsuit pursued by REI on the same facts present here, *REI Holdings v. Lienclear-0001*, No. 2:17-cv-00564 (D. Utah June 12, 2017), and while REI brought fraud and breach of fiduciary duty claims against Marcus, nowhere in that complaint is there any allegation of an oral contract between REI and Marcus, nor is there a cause of action for breach of contract against Marcus. *Id.*, [ECF No. 5 (Amended Complaint)].  Thus, when, in that action, the statute of limitations for tort claims presented no difficulties, REI brought no breach of contract claims against Defendant, but when the statute of limitations for tort did

become a problem, here, REI brought suit against Defendant for breach of contract.  This bolsters the Court's finding that REI's claims sound primarily in tort, not contract.

Moreover, in defending against Defendant Marcus' motion to dismiss for lack of personal jurisdiction in that case, REI argued that it did have personal jurisdiction over Marcus because the Tenth Circuit had held that "there is an interest in preventing tortfeasors from forcing plaintiffs to chase them to seek recovery."  *Id.*, [ECF No. 32 at 8 (citing *Benton v. Cameco Corp.*, 375 F.3d 1070, 1079 (10th Cir. 2004))].   In other words, in the District of Utah case, REI characterized Marcus as a tortfeasor in numerous documents, but never mentioned that Marcus had breached any contractual duties toward REI.

In sum, the Court holds that because the Complaint does not allege that Defendant refused to perform specific actions required under the alleged oral contract but, more accurately, alleges that Defendant failed to represent Plaintiff properly, Defendant's Motion to Dismiss Count One is GRANTED.

    B.    <u>Count Six (Breach of Implied Contract)</u>

Defendant moves to dismiss Count Six of Plaintiff's Complaint, breach of implied contract, for the same reasons it moved to dismiss Count One; namely, that Plaintiff's breach of contract counts sound in tort rather than contract.  [ECF No. 13-1 at 15-23].

Plaintiff opposes Defendant's motion on the grounds that Defendant has misconstrued Plaintiff's breach of implied contract cause of action. Plaintiff explains that Count VI for Breach of Implied Contract concerns one implied *at law*, which "is not a contract, but an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation: it is based on equitable principles to operate whenever justice requires compensation to be made." [ECF No. 22-1 at 11-12 (citing *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557 (2006))]. Plaintiff explains further that "[a]n implied in law contract may arise due to one party being unjustly enriched to the detriment of the other party. Therefore, whether or not Plaintiff and Defendant entered into an oral agreement as Plaintiff has also alleged, is irrelevant." *Id.* at 12 (citing *Vertex*, 278 Conn. at 574).

Plaintiff then argues that "Connecticut's Rules of Professional Conduct and substantive case law imposed certain duties and obligations on Defendant when representing REI both as an attorney and as a fiduciary including, but not limited to, the duties of candor, loyalty, honesty and to represent Plaintiff zealously and without conflicts of interest." *Id.* at 12-13 (citing cases). Plaintiff sums up:

> Defendant's personal knowledge of the quality of the tax liens was superior to Plaintiff's and he used that to his benefit. As alleged in the complaint, Defendant's conduct as Plaintiff's attorney involves self-dealing and conflicts of interest which resulted in a payments to him of $42,500.00 and $411,167.90 (Complaint, ¶16) which, but for Defendant's conduct in failing to inform Plaintiff of the problems with

the liens explained above and the restrictions the municipalities placed on resale, Defendant [sic: Plaintiff] would not have purchased the liens at the prices set forth in the purchase contracts and Defendant would not have received the payments for his fees. Defendant's conduct as alleged in Plaintiff's complaint (Count III ¶40-44) are violations of his duties and obligations to Plaintiff imposed by law that give rise to a contract implied at law. Accordingly, Defendant was unjustly enriched at Plaintiff's expense and Plaintiff has stated a valid claim for damages of at least the funds it paid Defendant at closing, if not more.

[ECF No. 22-1 at 13].

Defendant replies that Plaintiff was not unjustly enriched because the only cases Plaintiff cites in support of his unjust enrichment claims "do not address unjust enrichment or an implied contract." [ECF No. 23 at 8-9]. "Instead, the aforementioned cases only address fiduciary duties between attorneys and their clients, and violations thereof." *Id.* at 9.

Accepting at face value Plaintiff's assertion that Count VI concerns a breach of contract implied in law, Count VI must be dismissed as duplicative of Count V, Unjust Enrichment. As Plaintiff's cited *Vertex* case makes clear, is is well-settled in Connecticut that "an implied in law contract is 'not a contract, but an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation . . . It is based on equitable principles to operate whenever justice requires compensation to be made.'" 278 Conn. at 574 (quoting *Yale Diagnostic Radiology v. Estate of Fountain*, 267 Conn. 351, 359 (2004)). "An implied in law contract may arise due to one party being unjustly enriched to the detriment of the other party." *Id.* (citing *Yale Diagnostic*,

27

267 Conn. at 360).  "Accordingly, *an implied in law contract is another name for a claim for unjust enrichment.*"  *Id.* (citing *Meaney v. Conn. Hosp. Ass'n*, 250 Conn. 500, 511 (1999) (emphasis added)); *see also Meaney*, 250 Conn. at 511 ("Although, linguistically, such a claim is sometimes denominated an implied-in-law claim, or a quasi contract claim, it is more descriptive to call it what it is, a claim in restitution whose basis is the alleged *unjust enrichment* of one person at the expense of another.") (citing 1 G. Palmer, The Law of Restitution (1978) § 1.1, p. 5) (emphasis added).

As Plaintiff's Opposition to Defendant's Motion to Dismiss Count VI asserts that Count VI involves breach of an implied contract at law, it is entirely duplicative of Plaintiff's Count V for Unjust Enrichment and must be dismissed, Plaintiff's citation to several cases discussing breach of fiduciary duty notwithstanding.  Defendant's Motion to Dismiss Plaintiff's Count VI for Breach of Implied Contract at Law is GRANTED.

### C.    Count Two (Breach of the Implied Covenant of Good Faith and Fair Dealing)

Defendant argues that if the Court grants Defendant's Motion to Dismiss Count I for Breach of Contract, then Count II for Breach of the Implied Covenant of Good Faith and Fair Dealing must also fail because any such claim "can only occur when there is already a contract, i.e., an enforceable obligation, because [t]he implied covenant is derivative, that is, it does not create or supply new contract terms but grows out of existing ones."  [ECF No. 13-1 at 23-24 (quoting

*Boccanfuso v. Daghoghi*, 193 Conn. App. 137, 147 (2019))]; *see also id.* at 24 (citing *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 638 (2002) ("the existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing"). Defendant sums up: "Should the Court agree that REI has failed to state a claim for breach of oral contract or breach of implied contract between REI and Attorney Marcus, then this derivative claim must also fail." *Id.*

Plaintiff concedes that this Count depends on the validity of Count I for Breach of Contract. *See* [ECF No. 22-1 at 14 ("Having set forth a valid contract claim as explained above, Plaintiff's complaint alleges that Defendant breached the covenant of good faith and fair dealing by engaging in certain conduct that injured Plaintiff's right to receive the benefits of its contract.")].

Because Plaintiff concedes that its claim for Breach of the Implied Covenant of Good Faith and Fair Dealing depends on a valid underlying contract, as it must, and because the Court has held that Count I for Breach of Contract is Dismissed, *supra*, Defendant's Motion to Dismiss Count II is also GRANTED.

D. **Counts Three (Breach of Fiduciary Duty), Four (Legal Malpractice during Sale of Lien Portfolios), Seven (Fraudulent Non-Disclosure), Eight (Negligent Non-Disclosure), and Nine (CUTPA)**

Defendant argues that Count III for Breach of Fiduciary Duty, IV for Legal Malpractice (associated with the sale of the Lien Portfolios to REI), VII for Fraudulent Non-Disclosure, VIII for Negligent Non-Disclosure, and IX for CUTPA

29

against Defendant Marcus should be dismissed as time-barred because they only concern the sale of the two Lien Portfolios to Plaintiff, which occurred more than three years ago, triggering the applicable statute of limitations.

That these counts only concern the sale of the Portfolios is clear, Defendant argues, because the Complaint clearly distinguishes between actions that occurred in conjunction with the sale of the two Lien Portfolios, and those that occurred in connection with the enforcement of the Liens, which occurred later.   [ECF No. 13-1 at 8-15].   In effect, there were "two different 'representations'" *id.* at 11, which is indicated, according to Defendant, by the Complaint's careful temporal classification of the two:

- "[This complaint …] arises out of the representation by Marcus of REI in connection with the purchase and *subsequent collection* of two (2) portfolios of tax lien certificates issued by the cities of Hartford, Bridgeport and West Haven, Connecticut (the 'Portfolios')."  *Id.* at 9 (quoting Complaint ¶ 6) (emphasis in Memorandum of Law).
- Defendant agreed, "in or around February, 2015," to provide services "includ[ing], *inter alia*,  negotiating the terms of the purchase agreements, investigating the parties' representations, ensuring delivery of tax lien documents, and confirming licensing status of the involved entities.  REI proceeded to purchase the Optimum Portfolio for $3,912,852.35 in February 2015 and the LienClear Portfolio for $370,298.33 in July 2015."  *Id.* (quoting Complaint ¶¶ 12, 14-15).
- "*Thereafter*, Marcus continuously represented REI *in the enforcement and collection of the tax liens* in both Portfolios until his termination on August 15, 2017."  *Id.* at 10 (quoting Complaint ¶ 16) (emphasis in Memorandum of Law).
- "As attorney for ATF, Marcus knew or should have known or at least had access to information about the Portfolios held by ATF [initial seller to Optimum].  [Complaint ¶] 23.  Obviously, this alleged failure to disclose would necessarily have occurred prior to REI's purchases."  *Id.* at 11.
- "*Prior to closing of the Optimum Portfolio*, REI was not informed by Marcus that the municipalities needed to consent to the transfer of the liens in the

Portfolios to REI before the transfer [sale/assignment] occurred."   *Id.* (quoting Complaint ¶ 26) (emphasis in Memorandum of Law).

- "*After the sale of the Portfolios*, REI learned — *because Marcus had not informed REI prior to the closing* - that REI could not resell the liens without consent of the municipalities.   Marcus, Byrne, McOsker and Friedman knew that REI intended to resell the liens to individual customers when liens were sold to REI.  Marcus did not inform REI until *November of 2015* that such practice was disallowed by the municipalities." *Id.* (quoting Complaint ¶ 29) (emphasis in Memorandum of Law).

- "But for the conduct of Marcus *prior to the closing described infra*, REI would not have purchased the Portfolios for the purchase prices stated in the Optimum Agreement and the LienClear0001 Agreement." *Id.* at 11-12 (quoting Complaint ¶ 31) (emphasis in Memorandum of Law).

Defendant then notes that each Count "make[s] substantially similar claims, all of which unquestionably relate to the same basic tortious and/or improper conduct in connection with the 2015 Purchases:

. . .

Count III (incorporating all previous allegations by reference and claiming breach of fiduciary duty based upon Attorney Marcus 'superior' knowledge and understanding of tax lien sales in Connecticut);

Count IV at ¶ 47 (b) through (d) (in obtaining municipal consents, "negotiated away [REI's] rights and privileges", in "failing to incorporate the assignment contracts between the municipalities and ATF into the assignments to REI, which disallowed recovery of taxes paid directly to the municipalities instead of to ATF prior to closing", and failing to properly protect REI's interests in connection to West Haven's municipal liens);
. . .

Count VII at ¶58 (a) through (c) (alleging 'knowing and intentional' failures to advise REI that Marcus had represented ATF in the collection of the liens [prior to closing]", that "he either knew [or could have determined] that many of the liens in the Portfolios were redeemed, discharged or worthless", and that it would not be able to sell the liens in the Portfolios once acquired);

Count VIII (incorporating all previous allegations by reference and claiming negligence based upon the same allegations of Count VII); and

Count IX at ¶67 (a) through (c) (incorporating all previous allegations by reference and claiming CUTPA violations arising from the payment of legal fees to Marcus and advancement of his own 'entrepreneurial' interests over those of REI.)"

[ECF No. 13-1 at 12-13].

Defendant completes his discussion of the nature of the separate representations of Plaintiff by noting that in Count IV for Legal Malpractice, "[s]eparate from the allegations targeting the 2015 Purchases, REI sprinkles th[is] count[] with discrete, and far narrower, assertions concerning tortious and/or improper conduct by Marcus in connection with his subsequent representation in the Collection/Enforcement Matters.  For example, REI alleges:

In _foreclosing the liens_ in the Portfolios, Marcus failed in many cases to name lien holders whose liens were subsequent in time and right to those of REI as defendants thereby resulting in the subsequent liens not being foreclosed out and retaining their status as encumbrances on the subject properties to the detriment of REI which allowed them to later initiate foreclosure proceedings against REI to the detriment of REI[;]. Compl., Count IV at Para. 47 (a)

_In all the foreclosure actions_ filed by Marcus for REI, Marcus failed to name as proper Defendants other tax lien holders which resulted in the continued existence and enforceability of those tax liens to the detriment of REI[;]. *Id.* at Para. 47 (e).

Marcus even represented some of those subsequent lien holders _in foreclosure actions_ against REI after REI had acquired the property, or in cases, where those lienholders were simply attempting to foreclose out REI's tax liens before REI initiated its own foreclosure[;]. *Id.* at Para. 47 (f).

> Marcus failed to file ***as additional method of collection, lawsuits against the owners of the properties*** **when the tax liens in the Portfolios were recorded.** *Id.* **at Para. 47 (g).**

**[ECF No. 13-1 at 13-14 (emphasis in Memorandum of Law)].  Defendant argues that "[t]he above allegations are clearly distinct in time and substance from the allegations surrounding the 2015 purchases.  This further emphasizes that REI believes, and has pleaded, that Marcus represented it in separate and distinct matters – the 2015 Purchases followed by the Collection/Enforcement Matters."** *Id.* **at 14.  Thus, Defendant avers, "causes of action relating to or arising from Marcus' alleged representation of REI in connection with the 2015 Purchases are barred by the applicable statutes of limitation."  *Id.* at 14-15.**

**Noting that Connecticut General Statutes § 52-577 states that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of," [ECF No. 13-1 at 24-25], Defendant argues that Count III for Breach of Fiduciary Duty is time-barred because it is grounded in conduct that occurred in 2015, more than three years before Plaintiff filed suit:**

> **The breach of fiduciary duty, if any, was centered around what Marcus allegedly knew about the Tax Lien Portfolios being sold to REI, his alleged failure to provide REI with lien information, failure to ascertain or disclose to REI that many of the liens had been redeemed, discharged or were worthless, advancement of his own and ATF's interests over those of REI in not disclosing the above, and pre-closing failure to advise REI that it would not be able to sell the liens in the Portfolios.  See Compl., Count II at ¶38 (a) through (g); Count III.  These acts or omissions were all completed before or during the time of REI's purchases.  REI alleges the sale occurred in 2015, and it was aware of the restraint on re-sale or assignment (requiring municipal approval) no later than November 16, 2015.**

>Consequently, the three year statute of limitations governing breach of fiduciary duty claims began to run no later than November 16, 2015 and expired on or about November 16, 2018, well before REI commenced this action.

[ECF No. 13-1 at 27].

Defendant argues that Count IV for Legal Malpractice is time-barred by Connecticut General Statute § 52-577 to the extent it relies on alleged acts and/or omissions concerning Marcus' purported representation of REI in connection with the 2015 purchases.  [ECF No. 13-1 at 27-28].  Defendant anticipates that Plaintiff will invoke the "continuous representation doctrine" "to avoid the strict limitations period imposed by § 52-577," but argues that, for reasons that will be discussed, *infra*, the doctrine is inapplicable here because, *inter alia*, the sale of the two Lien Portfolios was a separate transaction from the subsequent enforcement/collection of same.  *Id.* at 28-32.  Thus, Defendant summarizes, "even assuming representation existed, these were entirely separate matters and there was no continuing representation of REI with respect to the 2015 Purchases after those transactions closed."  *Id.* at 32.

Defendant argues further that Count VII for Fraudulent Non-Disclosure and Count VIII for Negligent Non-Disclosure are time-barred by Connecticut General Statutes § 52-577 and § 52-584, respectively.

First, Count VII is time-barred because Defendant's alleged "knowing and intentional failure" to "(a) advise REI that he had represented ATF in connection with prior collection/enforcement actions involving liens in the portfolios; (b) to

34

advise that many of the liens were redeemed, discharged or worthless, or advise that he could determine same; and (c) advise that REI would not be permitted to resell the liens in the portfolios and did not do so until November 16, 2015.  Of course, all of these specific instances of fraud/nondisclosure occurred in 2015, and (a) and (b) prior to the closing of the purchases.  Indeed, in the very next paragraph "Marcus' fraudulent nondisclosures were made *to induce REI into purchasing the portfolios*."   [ECF No. 13-1 at 36 (quoting Complaint ¶ 59) (emphasis in Memorandum of Law)].  Thus, Defendant argues Count VII "is time barred and should be dismissed."  *Id.* at 37.

Next, Count VIII is time-barred, according to Defendant, because Plaintiff "advances the very same factual contentions in Count VIII as in Count VII, substituting "negligent" for "knowing and intentional."  [ECF No. 13-1 at 39 (citing Complaint, Count VIII, ¶¶ 63 (a) through (c), 64; as compared to Count VII, ¶¶58 (a) though (c), 59)].[4]

Finally, Defendant argues that Count IX (CUTPA) is time-barred by the three-year statute of limitations of Connecticut General Statutes § 42-110g(f), which states that "[a]n action under [CUTPA] may not be brought more than three years after the occurrence of a violation of this chapter."  [ECF No. 13-1 at 40].

---

[4] Defendant notes that Connecticut courts are mixed in whether they recognize a cause of action for negligent non-disclosure, and that there is confusion as to whether the three-year statute for Conn. Gen. Stat. § 52-577 applies or whether the two-year statute for Conn. Gen. Stat. § 52-584 applies, but argues that in either case, Plaintiff's Count VIII is time-barred.

Defendant argues that all the allegations in Plaintiff's Count IX for CUTPA concern the sale of the Lien Portfolios to Plaintiff:

> In support of this count, REI re-alleges Marcus' conduct as set forth in its General Allegations, and specifically avers that, in facilitating the sale to REI with knowledge that many of the liens were discharged, redeemed or worthless, Marcus advanced his own financial interests and those of ATF over REI because he knew he would be paid 'exorbitant' attorney's fees, and be paid to thereafter represent REI in the Collection/Enforcement Matters.   REI also alleges that, 'prior to closing', Marcus failed to advise REI that it would not be able to sell liens once they were purchased, and did not so advise until his letter dated November 16, 2015.

[ECF No. 13-1 at 40-41 (citing Complaint Count IX ¶¶ 67 (a)-(c))].   Defendant concludes that "all of these specific instances of CUTPA violations occurred in 2015, prior to the closing of purchases.   The three year statutory period, therefore, expired in 2018 and the CUTPA count should be dismissed."   *Id.* at 41.

Anticipating, as mentioned, that Plaintiff might employ the continuing course of representation doctrine to attempt to toll the statute of limitations, Defendant argues that the doctrine is inapplicable because neither prong of the test in *DeLeo v. Nusbaum*, 263 Conn. 588, 597 (2003), is met.   [ECF No. 13-1 at 29].   That case held that "a plaintiff may invoke the [continuous representation] doctrine, and thus toll the statute of limitations, when the plaintiff can show: (1) that the defendant continued to represent him with regard to the same underlying matter; and (2) either that the plaintiff did not know of the alleged malpractice or that the attorney could still mitigate the harm allegedly caused by that malpractice during the continued representation period."   *Id.*   First, asserts

Defendant, the sale and later enforcement of the Lien Portfolios were two separate matters separated by time, as the sale concluded in 2015 and the enforcement actions came later.  And, "[t]he nature, purposes and objectives of the two matters are and were completely different (the first to acquire the portfolios, the second to enforce and collect on specific liens within the portfolios), the parties were different, the contexts were different (transactional versus litigation), and the results were (or would have been) different.  Even the claims, harms and damages are different, as the complaint makes clear. Accordingly, even assuming representation existed, these were entirely separate matters and there was no continuing representation of REI with respect to the 2015 Purchases after those transactions closed."   [ECF No. 13-1 at 31-32]. Defendant also claims prong two of *DeLeo* is unmet "because REI has not pleaded (nor could it) that it did not know of the alleged malpractice in 2015 or that Marcus could mitigate the alleged harm caused by the malpractice."  *Id.* at 29.

Defendant also cites a Connecticut Superior Court case, *Genua v. Devlin, Peters & Tarpey, LLC*, No. TTD-CV07-5001764-S, 2012 WL 953403 (Conn. Super. Ct. Feb. 24, 2012), for the proposition that "a 2002 transaction involving the sale of interest of a partnership agreement and a subsequent 2005 transaction involving the preparation of a quitclaim deed for the division of real property were not the same underlying matter for purposes of the continuing representation

doctrine" because "[a]lthough the plaintiff in Genua was involved in both transactions, the 2002 and 2005 transactions were between different parties and involved different purposes." [ECF No. 13-1 at 30 (citing *Genua*, 2012 WL 953403, at *1, 8)]. Defendant cites a second Connecticut Superior Court case, *Ogle Specialty, LLC v. Wiegand*, No. NNH-CV11-6020553-S, 2012 WL 3089705 (Conn. Super. Ct. July 3, 2012), in which the court held that "a real estate purchase and closing that concluded in 2006 and a subsequent notice of violation and imposition of environmental compliance program with respect to the same commercial property in 2009 were not the same underlying matter for purposes of the continuous representation doctrine." [ECF No. 13-1 at 31 (citing *Ogle Specialty*, 2012 WL 3089705, at *3-5)]. Defendant analogizes those cases to the instant matter, summarizing that "Marcus' purported representation in connection with the 2015 Purchases was completely separate and distinct from his representation in the subsequent Collection/Enforcement Matters." *Id.*

Plaintiff, as Defendant anticipated, counters that the applicable three-year statute of limitations is tolled because of the continuous course of representation doctrine. [ECF No. 22-1 at 4-6]. Plaintiff accuses Defendant of "attempt[ing] to create his own version of a 'Chinese Wall' between Defendant's representation of Plaintiff in purchasing tax liens and thereafter, in collecting and enforcing the same liens." *Id.* at 5. This is improper, according to Plaintiff, because "Plaintiff's complaint clearly alleges facts that evidence that Defendant was retained with the

expectation that he would represent Plaintiff initially in the purchase of the liens

and then in the collection of the very same liens as follows:

 8. After expressing interest in purchasing the Portfolios, <u>REI was referred to Marcus by McCosker, Byrne and Friedman for representation</u> (emphasis supplied).  Complaint, ¶ 8.

9. At that time, Marcus represented ATF in the collection of the liens in the Portfolios prior to the purchase by REI although Marcus failed to disclose that fact to REI at the time.  Likewise, McCosker, Byrne and Friedman did not disclose to REI at that time that Marcus was representing ATF.  Id. at ¶ 9.

10. Marcus was then retained by REI to represent REI in the purchase of the Portfolios.  <u>Marcus represented to REI that he had significant experience in the purchase and collection of Connecticut municipal tax liens and possessed the requisite professional expertise to represent REI in the purchase, resale and collection of the liens in the Portfolios</u>.  Based on his alleged experience and expertise, Marcus was in superior position to REI in that REI had not previously purchased tax liens portfolios in the State of Connecticut (emphasis supplied).  Id. at ¶ 10.

11. <u>Under an oral agreement in or around February 2015, REI and Marcus agreed that Marcus would provide all services necessary to ensure that valid and legal assignment of the tax liens in the Portfolios to REI so that REI had the ability and legal entitlement to re-sell and/or to collect, receive and retain the balance due and to enforce the collection of the tax liens</u>(emphasis supplied).  Id. at 11.

16. REI paid Marcus the sum of $42,250 for legal services ($35,000) and lien recording fees ($7,250) in connection with the purchase of the two Portfolios.  REI also paid Marcus the sum of $411,167.90 for attorney fees and costs incurred by Marcus for services rendered to, upon information and belief, ATF and possibly others in connection with the collection of the liens in the Portfolios prior to the sale to REI.  <u>Thereafter, Marcus continuously represented REI in the enforcement and collection of the tax liens in both Portfolios until his termination on August 15, 2017. (emphasis supplied)</u> Id. at ¶16.

Plaintiff sums up:

**Affording Plaintiff every reasonable inference as required by law, Plaintiff has alleged more than sufficient facts to show that the parties contemplated an extended relationship where Defendant would continuously represent Plaintiff in the purchase of the two tax portfolios and then in the enforcement and collection of the very same liens. Accordingly, to classify Defendant's representation of Plaintiff in the purchase of the liens and the collection thereof as 'separate' is contrary to the parties [sic] expectations and actions as more particularly plead in the complaint.**

[ECF No. 22-1 at 6].

Plaintiff argues that the elements of *DeLeo v. Nusbaum* are met, thereby tolling the statutes of limitations, because the purchase and later lien enforcement matters were one and the same, and because Plaintiff did not know about Defendant's breaches beyond the failure to inform Plaintiff of the restraint of resale and assignment of the liens, which were comprised of a "myriad of problems." [ECF No. 22-1 at 20]. Plaintiff also argues that legal representation "continues for the purposes of the continuous representation doctrine until either the formal or the de facto termination of the attorney-client relationship," neither of which happened here. *Id.* at 18 (citing *Straw Pond Assocs., LLC v. Fitzpatrick, Mariano & Santos, P.C.*, 167 Conn. App. 691, 719 (2016)).

As regards Count III for Breach of Fiduciary Duty and Count IV for Legal Malpractice, Plaintiff argues that these causes of action are not time barred because "[w]hile the three-year statute of limitations in Connecticut General Statutes § 52-577 is applicable in this case as Defendant contends," the continuing course of conduct or representation doctrines work to toll the

40

applicable three-year statute.   [ECF No. 22-1 at 16-20].   Plaintiff states that the
continuing course of conduct doctrine tolls the statute if there is "evidence of a
breach of a duty that remained in existence after commission of the original
wrong related thereto."  *Id.* at 16-17 (citing *Lee v. Brenner, Saltzman & Wallman,
LLP*, 128 Conn. App. 250, 257 (2011).   "Where Connecticut's Supreme Court has
upheld a finding that a duty continued to exist after the cessation of the act or
omission relied upon, there has been evidence of either a special relationship
between the parties giving rise to such a continuing duty or some later wrongful
conduct of a defendant related to the prior act."  *Id.* at 17 (citing *Lee*, 128 Conn.
App. at 257).   That standard is met as regards Count III because "[t]hat duty
included but is not limited to Defendant's fiduciary duties of candor, loyalty and
honesty owed to REI based on his superior position and knowledge of tax liens
sales in Connecticut and in particular, Defendant's knowledge of the specific tax
liens that REI was purchasing.   Defendant's duty to REI to fully disclose the
problems and issues with the tax liens as more particularly described in the
complaint and his duty to rectify to the extent possible his deceptions until his
termination on August 15, 2017."  *Id.* at 19 (citing *Fenn v. Yale Univ.*, 238 F. Supp.
2d 615, 638 (D. Conn. 2003), which purportedly held that the continuing course of
conduct doctrine tolled the statute because as a fiduciary the defendant had an
ongoing and continuing duty to act in the Plaintiff's interest, to disclose the facts,
and to rectify his prior deceptions).   And Plaintiff asserts that the continuing

41

course of representation doctrine, as discussed, tolls the statute as regards Count IV for Legal Malpractice.  Finally, Plaintiff notes that "it is important to reiterate that Defendant is not seeking to dismiss any of Plaintiff's claims for legal malpractice or breach of fiduciary duty arising from Defendant's representation of Plaintiff in the collection of the tax liens.  As such, should the Court grant the motion to dismiss it must be limited to those claims arising out of the purchases of the tax liens only." *Id.* at 20.

Plaintiff argues as regards Counts VII and VIII for Fraudulent and Negligent Non-Disclosure that they are not time-barred because of the continuous representation doctrine.  This is because as regards Count VII that "[w]hen a defendant like the defendant in this case is an attorney and a fiduciary with duties to disclose, the continuous representation doctrine acts to extend the limitation period in §52-577 until the duty terminates," which in this case is when Marcus was terminated on August 15, 2017.  [ECF No. 22-1 at 23-25 (citing *Straw Pond*, 167 Conn. App. at 719)].  As regards Count VIII, Plaintiff argues that "[i]n so much as Plaintiff relies on the application of General Statutes §52-577 and the continuous course of conduct / representation doctrine[,] Plaintiff reiterates its argument above with the same force and effect as if set forth herein."[5]

---

[5] Plaintiff also addresses Defendant's argument that "the two-year limitations period in General Statute § 52-584 could apply," and "maintains that it does not," and presents argument and caselaw as to why not.  As the Court' resolution of Defendant's Motion to Dismiss Count VIII does not depend on whether § 52-584 applies or not, the Court declines to address it.

Finally, as to CUTPA, Plaintiff argues that the continuing course of conduct doctrine tolls the statute because "Defendant owed certain fiduciary duties to Defendant [sic: Plaintiff] that he breached [and h]is continuous representation of Defendant [sic: Plaintiff] and his duty to disclose his prior deceptions and/or mitigate his breaches continued at least until his termination on August 15, 2017." *Id.* at 26-27 (citing *Johnson v. J.P. Morgan Chase Bank*, No. 3:17-cv-01995 (VLB), 2019 WL 1403396, at *4 (D. Conn. Mar. 28, 2019)).

Defendant replies that the first prong of the continuous representation doctrine requiring continuing representation in the same underlying matter is not met because "the Complaint identifies two separate and distinct periods of representation: first, representation in the purchase of the Portfolios, Compl. at ¶10; and, second, representation in specific enforcement and collection actions, Compl. at ¶16," which states that "[following the Portfolio purchases in 2015], Marcus continuously represented REI in the enforcement and collection of the tax liens in both Portfolios until his termination on August 15, 2017." [ECF No. 23 at 3]. Defendant also argues the second prong of the doctrine requiring "either the plaintiff did not know of the alleged malpractice *or* that the attorney could still mitigate the harm allegedly caused by that malpractice during the continued representation period" is not met because "Plaintiff alleged—and conceded in his objection—that it knew by November 16, 2015, that there were issues with regard to its ability to re-sell the tax liens," and because "REI needed to allege that the

Defendant could have mitigated the alleged harm—yet REI failed to allege same." *Id.* at 4 (distinguishing *Targonski v. Clebowicz*, 142 Conn. App. 97 (2003), where the court allegedly held that "defendant could have mitigated the harm of purchase and sale of subject house during period before the pending closing date).

The Court agrees with REI that the continuing course of representation and continuing course of conduct doctrines operate to toll the three-year statute of limitations of Connecticut General Statute § 52-577 for each of these Counts.

First, as noted, Connecticut General Statute § 52-577 provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."   "[Section] 52–577 is a statute of repose in that it sets a fixed limit after which the tortfeasor will not be held liable and in some cases will serve to bar an action before it accrues."   *Ogle Specialty*, 2012 WL 3089705, at *2 (quoting *Lee*, 128 Conn. App. at 257).   "Furthermore, '[s]ection 52–577 is an occurrence statute, meaning that the time period within which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs ... [T]he history of the legislative choice of language precludes any construction ... delaying the start of the limitation period until the cause of action has accrued or the injury has occurred ... [T]he only facts material to the trial court's decision on a motion for summary judgment are the date of the wrongful conduct alleged in the complaint and the date the action was

44

filed.'"  *Id.* (quoting *Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC*, 69 Conn. App. 151, 158–59 (2002)).  "It is important to note that '[t]he relevant date of the act or omission complained of, as the phrase is used in § 52–577, is the date when the negligent conduct of the defendant occurs and not the date when the [plaintiff] first [sustains] damage .'"  *Id.* (quoting *Farnsworth v. O'Doherty,* 85 Conn. App. 145, 149 (2004)).

Thus, as regards REI's purchase of the two Lien Portfolios, which occurred in February and July 2015, all claims against Defendant regarding same are time-barred as of REI's filing the instant matter on August 13, 2020, unless saved by one or more tolling doctrines.

Out of these concerns and justifications came the *DeLeo* "narrow, two-pronged continuing representation rule," *Genua*, 2012 WL 953403, at *6, in which the statute may be tolled "when the plaintiff can show: (1) that the defendant continued to represent him with regard to the same underlying matter; *and* (2) either that the plaintiff did not know of the alleged malpractice *or* that the attorney could still mitigate the harm allegedly caused by that malpractice during the continued representation period."  *DeLeo*, 263 Conn. at 597 (emphasis in original).

The Court finds that the nature of the lien portfolios purchased indicates that prong one of *Deleo* is satisfied because the purchase of the lien portfolios at issue would have been nonsensical without the subsequent enforcement

45

activities that Defendant Marcus undertook.  Lien portfolios are purchased at a discount to face value, with the purchaser realizing a profit from his venture only if he subsequently resolves the underlying liens in some manner.  Here, as a result, Marcus' assistance in purchasing the lien portfolios and the subsequent enforcement activities related to the same matter because without the subsequent enforcement activities the lien portfolios themselves were worthless. As to the second *Deleo* prong, the Court finds that at least the first sub-branch is met, in that Plaintiff did not know of the extent of the Defendant's alleged malpractice, which is evidenced by Plaintiff continuing to engage Marcus' services for some time past 2015.

Courts have found in analogous situations representations to entail the same matter.  *See Straw Pond*, 167 Conn. App. 691, 724-26 (reversing grant of summary judgment in case involving construction of senior housing project because material issues of fact existed as to whether continuing course of representation doctrine tolled the statute of limitations when attorneys represented Plaintiff at global settlement conference occurring after statute had run, despite Plaintiff hiring other attorneys); *Targonski v. Clebowicz*, 142 Conn. App. 97, 105-06 (2013) (reversing grant of summary judgment in case involving construction of a land-locked house and right-of-way over seller's property when attorney failed to ensure right-of-way was entered in deed and had the

46

opportunity to correct his error and allow construction of house with proper driveway).

Other courts have found in non-analogous situations representations to entail entirely separate matters.  *Genua*, 2012 WL 953403, at *1, 8 (2002 transaction involving sale of interest of a partnership agreement and separate 2005 transaction involving preparation of a quitclaim deed for the division of real property not same underlying matter for purposes of the continuing representation doctrine because although plaintiff was involved in both transactions, the 2002 and 2005 transactions were between different parties and involved different purposes); *Ogle Specialty*, 2012 WL 3089705, at *3-5 (real estate purchase and closing that concluded in 2006 and subsequent separate notice of violation and imposition of  environmental compliance program with respect to the same commercial property in 2009 not the same underlying matter for purposes of the continuous representation doctrine); *Peduto v. Durr*, 468 N.Y.S.2d 953, 960 (N.Y. App. Div. 1983)[6] (representation of plaintiff for real estate purchase different matter than subsequent optional sale for the same plaintiff of the same property because "there was no continuous representation after the alleged 1974 malpractice which would effectively toll the Statute of Limitations.");

---

[6] *Genua* pointed out that "In adopting the test for continuous representation, the Connecticut Supreme Court referred to New York law in explaining its rationale, *see DeLeo v. Nusbaum, supra,* 263 Conn. at 594, 595, and also referred thereto in noting that in adopting the doctrine the court was joining the majority of states that had done so previously. See *id.,* at 597 n. 2. Accordingly, New York law

*Robbins v. McGuinness,* 178 Conn. 258, 261–62 (1979) (legal services completed at the time of transfer of property) (cited by *Genua*, 2012 WL 953403, at *8); *Bagoly v. Riccio,* 102 Conn. App. 792, 795 (2007) (attorney last represented plaintiff when negotiated, written agreement for modification was adopted by the court on the same day).

As regards the continuing course of conduct doctrine, "[t]he policy underlying the continuing course of conduct doctrine is similar to the policy underlying the continuous representation doctrine "in that during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and *may yet be remedied.*"  *Ogle Specialty*, 2012 WL 3089705, at *6 (quoting *Rosenfield*, 69 Conn. App. at 164) (emphasis in *Rosenfield*).   "For example, the doctrine is generally applicable under circumstances where [i]t may be impossible to pinpoint the exact date of a particular negligent act or omission that caused injury or where the negligence consists of a series of acts or omissions and it is appropriate to allow the course of [action] to terminate before allowing the repose section of the statute of limitations to run ..." *Id.* (citing *Sanborn v. Greenwald*, 39 Conn. App. at 295–96). "'[W]hen the wrong sued upon consists of a continuing course of conduct,' the continuing course of conduct doctrine provides that 'the statute does not begin to run until that course of conduct is completed.'"  *Gibson*, 2020 U.S. Dist. LEXIS

provides guidance in applying the doctrine here.

33498, at *14 (quoting *Flannery v. Singer Asset Fin. Co.*, 312 Conn. 286, 311 (2014)).  This is because "'it would be unreasonable to require or even permit [the plaintiff] to sue separately over every incident of the defendant's unlawful conduct'—specifically, where '[t]he injuries about which the plaintiff is complaining . . . are the consequence of a numerous and continuous series of events.'"  *Id.* at *15 (quoting *Watts v. Chittenden*, 301 Conn. 575, 587-88 (2011)).

Here, given the tightly intertwined nature of Marcus' representation of the lien portfolio purchases and the subsequent enforcement activities, the Court finds the statute tolled based on the continuing course of conduct doctrine.

In sum, under either the continuing course of representation doctrine or its "close relative," the continuing course of conduct doctrine, *Gottesman v. Kratter*, No. FST-CV17-6031889-S, 2020 U.S. Conn. Super Lexis 957, at *23 (Conn. Super. Ct. Mar. 17, 2020), the Court finds that Marcus' necessary representation of REI in enforcing the lien portfolios, without which the lien portfolios were worthless, was the same representation as during the purchase, and therefore the statute of limitations is tolled.

The Court DENIES Defendant's Motion to Dismiss Count III for Breach of Fiduciary Duty, IV for Legal Malpractice during the sale of the Lien Portfolios, VII for Fraudulent Disclosure, VIII for Negligent Disclosure, and IX (CUTPA), as the statute of limitations is tolled and therefore these causes of action are not time-barred by Connecticut General Statute § 52-577.

E.     Count Five (Unjust Enrichment)

Defendant argues that this Count, if the Court dismisses REI's Count I for Breach of Contract, which it has, should be dismissed because "REI's significant delay in commencing the present action gives rise to a defense of laches."  [ECF No. 13-1 at 33].  Laches is applicable, Defendant asserts, because "the primary focus of REI's complaint and the supporting nucleus of operative facts all relate to and arise from the 2015 Purchases of the two tax lien portfolios – one from Optimum and the other from LienClear.  By its own admission, REI knew of the problems with the portfolios, not the least of which was the restraint on further assignment, by the end of 2015."  *Id.* at 34.  "However, rather than commence a proper and timely action in Connecticut, REI chose to sue Marcus and others in federal district court in Utah in 2017."  *Id.* at 35.  "Marcus was forced to vigorously defend the Utah Action, and he ultimately prevailed.  Following substantial briefing and oral argument, by order dated February 8, 2019, the Utah District Court dismissed the action for lack of personal jurisdiction. . . . REI did not appeal the ruling.  REI did not immediately commence a new action in Connecticut invoking proper jurisdiction and venue.  Rather, REI waited nearly 18 months before filing this case.  The delay is inexcusable and Marcus' undue prejudice has and will continue to be substantial if the action is permitted to proceed.  There is no legitimate reason to permit REI's belated attempt to obtain equitable relief under these circumstances."  *Id.* at 35-36.

50

Plaintiff responds that "[t]he defense of laches is an affirmative defense, which is generally not appropriately raised in a motion to dismiss." [ECF No. 22-1 at 22 (citing *Lennon v. Seaman*, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999)). "A court may consider the defense of laches on a motion to dismiss when the defense of laches is clear on the face of the complaint." *Id.* (citing *Lennon*, 63 F. Supp. 2d at 439). "Laches involves first a delay that was inexcusable, and, second, that the delay must have prejudiced the defendant, [t]he burden is on the party alleging laches to establish that defense, [and t]he mere lapse of time does not constitute laches unless it results in prejudice to the opposing party as where, for example, the opposing party is led to change his position with respect to the matter in question." *Id.* at 22-23 (citing *Cummings v. Tripp*, 2014 Conn. 67, 88 (1987)). Because "Defendant does not actually state what 'prejudice' he has suffered from Plaintiff's filing," Plaintiff asserts that "Defendant's motion to dismiss Plaintiff's claim for unjust enrichment must be denied." *Id.* at 23.

The Court DENIES Defendant's Motion to Dismiss Count V for Unjust Enrichment for the following reasons. First, the Court cannot find on this record that REI unreasonably delayed in suing Marcus, as "the defense of laches is [not] clear on the face of the complaint." *Lennon*, 63 F. Supp. 2d at 439. Second, Defendant fails to give a specific reason why it might be prejudiced by the delay, and the Court finds that such a conclusory claim to an undefined prejudice militates against granting Defendant's Motion to Dismiss this claim.

51

Defendant's Motion to Dismiss Count V for Unjust Enrichment is DENIED.

### V. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, [ECF No. 13], is GRANTED-IN-PART.   Counts One, Two, and Six are DISMISSED with prejudice. The case will proceed on Plaintiff's Counts Three, Four, Five, Seven, Eight, and Nine.   The Court lifts the stay, [ECF No. 24], and will enter a Scheduling Order under separate cover.

IT IS SO ORDERED

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: July 27, 2021.

52